AO 91 (Rev. 11/11) Criminal Complaint                                    AUSA Corey B. Rubenstein (312) 353-8880

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ROBERT DUNLAP

CASE NUMBER:  23CR591

**UNDER SEAL**



FILED
11/7/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, Jeffrey Jamrosz, the complainant in this case, state that the following is true to the best of my knowledge and belief:

From in or about 2018, and continuing to the date of this complaint, in the Northern District of Illinois, Eastern Division, and elsewhere, ROBERT DUNLAP, the defendant, violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| Title 18, United States Code, Section 1341 | By having devised a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and having caused to be delivered by mail any matter or thing for the purpose of executing the scheme. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

/s/ *Jeffrey Jamrosz*

JEFFREY JAMROSZ
Special Agent,
Federal Bureau of Investigation

Type text

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: November 7, 2023

*Judge's signature*

City and state: Chicago, Illinois

SHEILA M. FINNEGAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, JEFFREY JAMROSZ, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed for 19 years. My current responsibilities include the investigation of white collar crimes, including mail, wire, and bank fraud.

2. This affidavit is submitted in support of a criminal complaint alleging that ROBERT DUNLAP has violated Title 18, United States Code, Section 1341. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging DUNLAP with mail fraud, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, my own training and experience as an FBI Special Agent, and the experience and training of other agents with whom I have consulted. It is also based on the review of records provided by third parties, interviews and testimony of witnesses, publicly available online information, information provided to law enforcement by the Securities and Exchange Commission ("SEC"), and DUNLAP's own testimony before the SEC.

**FACTS SUPPORTING PROBABLE CAUSE**

## I.    SUMMARY

4.    As detailed below, there is probable cause to believe that DUNLAP devised and executed a scheme to defraud investors in connection with his promotion of a purported cryptocurrency called "Meta1 Coin." Specifically, DUNLAP promoted Meta1 Coin by falsely stating, and causing to be stated, that the cryptocurrency was backed up by approximately $44 billion in gold and fine art. To support his false representations about those assets, DUNLAP also falsely stated and caused to be stated: (1) that he and/or Meta1 Coin Trust purchased and possessed the gold and fine art; (2) that the value of those assets was guaranteed and secured by insurance, indemnities, and/or bonds, including bonds purportedly backed by the U.S. Treasury; and (3) that DUNLAP hired one or more independent auditing firms, including KPMG, to physically audit the purported assets including gold reserves and certify its value.

5.    DUNLAP also caused the purported market price and trading volume of Meta1 Coin to be inflated on a Meta1 website by the fraudulent use of software programs called "bots" and trading scripts. Additionally, DUNLAP falsely stated to investors that an SEC lawyer was "extremely impressed" with what Meta1 Coin Trust had done and was personally investing in the Meta1 Coin. After the SEC subsequently brought an enforcement action against DUNLAP and others, DUNLAP falsely stated that the case against him and Meta1 Coin Trust had been settled. As a result of DUNLAP's scheme, investors have paid more than $10 million to DUNLAP

and his associates/affiliates. DUNLAP's scheme is ongoing at the time of this complaint.

## II. DUNLAP'S CREATION AND CONTROL OF "META1 COIN"

6. Cryptocurrencies are virtual currencies that are generally not issued by any government, bank, or company, but instead are generated and controlled through computer software operating on decentralized peer-to-peer networks. Popular cryptocurrencies can be used to purchase goods or services, can be exchanged for other cryptocurrencies, and can be exchanged for conventional currencies, like United States Dollars.

7. According to the Promotional Materials (defined below) and information provided by other witnesses, in or about early 2018, DUNLAP purported to create a new cryptocurrency, which he called "Meta1 Coin." Specifically, according to versions of a so-called "White Paper" promoting Meta1 Coin that were published on Meta1-associated websites, DUNLAP was the "Founder" of Meta1 Coin and the "Executive Trustee" of a trust called "Meta1 Coin Trust." Bank account records also reflect that DUNLAP was a signatory on multiple bank accounts titled to Meta1 Coin Trust. Moreover, Meta1's informational website currently identifies DUNLAP as the "Founder" and "Executive Trustee" of Meta1's five-person team.

8. Law enforcement has obtained and reviewed various types of promotional materials and media that DUNLAP used to promote Meta1 Coin, including, among other things: (a) the above-referenced White Papers; (b) Meta1-associated websites; (c) online webcasts hosted by Promoter A and others in which

3

DUNLAP appeared and discussed Meta1 Coin; (d) other videos posted online in which DUNLAP provided "updates" regarding, and otherwise discussed, Meta1 Coin; (e) Meta1 Coin marketing emails to investors and prospective investors, many of which referred to DUNLAP by name; and (f) Zoom calls where DUNLAP provided information to Meta1 Coin investors and prospective investors (collectively, "Promotional Materials").

9. According to Board Member A, who was a board member of Meta1 Coin and who supervised the development of Meta1 Coin's software technology, data systems and website interfaces until in or about September 2021, DUNLAP exercised authority and control over information published on those websites, including, as discussed below, the purported values of gold assets supposedly backing Meta1 Coin.

## III. FALSE STATEMENTS ABOUT $1 BILLION IN FINE ART

### A. Dunlap's Purported Purchase of Art from Individual A

10. In March 2018, at the inception of his scheme, DUNLAP purported to enter into a written contract on behalf of Meta1 Coin Trust to purchase various pieces of art from Individual A. According to Individual A's SEC testimony and as reflected in a copy of that purported contract, the stated purchase price was $125 million, although Individual A recalled that his cost of acquiring that art was some amount over $1 million. According to the contract, of the $125 million purchase price, Meta1 Coin Trust was required to make an immediate down payment of $37.5 million, directing that payment to the IRS to cover Individual A's tax liability arising from

the sale. The $87.5 million balance was to be paid by Meta1 Coin Trust under the terms of a promissory note.

11. According to Individual A, DUNLAP and Meta1 Coin Trust never made the $37.5 million downpayment, and Individual A received only approximately $16,000 from Meta1 Coin Trust toward the $87.5 million balance of the promissory note. (Law enforcement has identified only two checks made payable to Individual A from Meta1 Coin Trust bank accounts, totaling approximately $17,898.90.) Also according to Individual A, he never relinquished possession of any of the art to DUNLAP or Meta1 Coin Trust.

12. On or about July 17, 2018, Individual A's lawyer sent DUNLAP a letter providing formal notice of DUNLAP/Meta1 Coin Trust's breach of the purchase agreement. Individual A subsequently filed a lawsuit against DUNLAP/Meta1 Coin Trust in Texas state court, which complaint was served on DUNLAP in or about February 2019 (according to a subsequently issued appellate court opinion). That court entered a default judgment against DUNLAP and Meta1 Coin Trust on or about June 13, 2019, which judgment: (1) declared that DUNLAP and Meta1 Coin Trust had no interest in Individual A's art; and (2) awarded $25 million in damages against DUNLAP and Meta1 Coin Trust.

**B. The Fictitious "Surety Bond" to the U.S. Treasury**

13. According to DUNLAP's SEC testimony, in connection with his assertions that he and/or Meta1 Coin Trust owned, possessed, and had obtained insurance for $1 billion in art (detailed below), through a "Private Surety Bond."

5

DUNLAP further stated that the document, shown as follows, or a similar version of that document, was a valid instrument recorded with U.S. Treasury Department. The document had a purported face value of $1 billion, identifying Meta1 Coin Trust as the named "Insured/Surety" and the Secretary of the U.S. Treasury, Steve Mnuchin, as the "Fiduciary" for the bond:



The document also contained a "Description of Insured Art Work," listing 18 pieces and assigning to each of them round-dollar values totaling exactly $1 billion:

| Name of Piece | Painter | Valuation | Meta 1 Coin ID No |
|---|---|---|---|
| Francoise | Pablo Picasso | $80,000,000 | Meta100100 |
| Lady and Devil | Pablo Picasso | $26,000,000 | Meta100101 |
| Bull Fight | Pablo Picasso | $27,000,000 | Meta100102 |
| 3 Women | Pablo Picasso | $18,000,000 | Meta100103 |
| Abstrait Concentré | Edward Degas | $10,200,000 | Meta100104 |
| Trois Danseurs | Egon Schiele | $16,000,000 | Meta100105 |
| Seated Woman | Egon Schiele | $17,500,000 | Meta100106 |
| Jeanne | Amedeo Modigliani | $240,000,000 | Meta100107 |
| Small Village | Vincent Van Gogh | $532,000,000 | Meta100108 |
| Girl on A Swing | Renoir | $14,000,000 | Meta100109 |
| La Magie | Alfred De Breanski Sr | $125,000 | Meta100110 |
| Dignitaire | Federico Barocci | $1,450,000 | Meta100111 |
| Madona | Guido Reni | $125,000 | Meta100112 |
| Belle Femme | Francois Boucher | $1,600,000 | Meta100113 |
| Self Portrait | Salvador Dali | $2,500,000 | Meta100114 |
| Cat woman | Salvador Dali | $2,500,000 | Meta100115 |
| Femme | Salvador Dali | $2,500,000 | Meta100116 |
| Skol | Salvador Dali | $2,500,000 | Meta100117 |
| | Total Art Value | $1,000,000,000 | |

6

The "bond" further stated that any claims under it should be charged by the U.S. Treasury against a supposed private Treasury Account belonging to a trust controlled by Individual D, who signed the bond as "Surety." Individual D was identified in a version of the Meta1 Coin White Paper as a Board Member of Meta1 Coin Trust.

14.     Additionally, DUNLAP referred to the purported bond during a webcast with Promoter A on or about July 5, 2019, stating, "we led our art portfolios with a legal bond, a surety bond backed by the U.S. Treasury."

15.     According to representatives of the U.S. Treasury Department's Bureau of the Fiscal Service, that "Private Surety Bond" was a fictitious instrument, which, contrary to its assertions, did not bind or obligate the U.S. Treasury in any manner. Additionally, according to those same representatives, neither DUNLAP, Meta1 Coin Trust, nor Individual D had an account at the Treasury Department with any balance that would support such a "bond."

**C.     Specific False Statements about Buying, Owning, Possessing, and Insuring $1 Billion in Fine Art**

16.     On or about September 5, 2018, DUNLAP appeared on a webcast called "Crypto Vision," during which he stated that he personally purchased and paid for $1 billion worth of art with his "own money," that he physically possessed that art, and that he assigned that art to back Meta1 Coin:

> Interviewer: Did you buy this? I mean it sounds like on your website you talk about having $1 billion worth of art. *Did you buy that yourself with your own money?*
>
> Dunlap: *Yes.*

Interviewer: Okay. How did you come up with such *deep pockets* to buy this if you don't mind me asking?

Dunlap: Well, *I've been fairly successful for the last 20 years* and, you know, I've done very well. And so, you know, with that said, you know, *we had to buy the art*, we had to acquire the art to start it. And so, yes. And then with that said my previous model, I mean we didn't pay retail price. You know, we did get discounts and we're very savvy in acquisitions. [Emphases added.]

17. During that same webcast, DUNLAP stated that he was on the verge of purchasing additional "billions of dollars in art" and that a contract was going to be executed the next week, with the goal of causing the asset value of Meta1 Coin to increase by a factor of 1,000—from $22.22 per coin to $22,000 per coin:

> [W]e have many, many billions of dollars of art that are ready to come in once we're ready for them. . . And so *I have a contract we're about to sign* that's just going to completely blow this off. The plan—I mean it's a massive amount of art that we're about to bring in, and once I sign the contract I could speak more, more about it. So every, every billion dollars of art assignment the coin goes up $22, and so that's just asset value and the coin itself.
>
> * * *
>
> [O]ur goal is to get the asset value to, you know, several trillion dollars, and so by that point the coins will be $22,000 each. So for us to do that *we'll spend a lot of the money to buy the—you know, to acquire the art* to run the coin as a general administrative expense. . . And *we made a transaction with one of the largest art holders last week and it's being signed next week*. [Emphases added.]

18. As detailed above, DUNLAP's assertions that he purchased and possessed $1 billion in art, and that he was in the process of purchasing billions of dollars of additional art, were false. In particular, by the date of that webcast, Individual A had provided DUNLAP with a formal notice of breach of their art purchase agreement due to DUNLAP's failure to make any of the $37.5 million down

8

payment, and Individual A had not given DUNLAP possession of any of the art. Moreover, law enforcement has obtained account records for at least 20 bank accounts associated with Meta1 Coin Trust, DUNLAP, and their associates, covering the time period from March 2017 to March 2023 (the "Meta1/Dunlap Bank Records"). With the exception of the approximate $17,898.90 paid to Individual A, those records show no payments indicating the purchase of any art. (A wire transfer of approximately $143,774.97 made on approximately June 12, 2018, to MMT LLC was also identified. Basic online searches indicate that MMT LLC sells laboratory equipment, which could possibly be used for the forensic analysis of art.)

19.     In the same webcast on September 5, 2018, DUNLAP stated that all the art was insured by a supposed "surety bond" and that the art was secured in a vault:

> Dunlap: The art is guaranteed by a surety bond in addition to itself, right, and that is the backing for the coin. The art is never sold, the coins are sold. . . And that art is always security for the coin...
>
> Interviewer: And you have that secured in a vault somewhere?
>
> Dunlap: Yes, absolutely.
>
> Interviewer: *And it's insured I'm sure.*
>
> Dunlap: *Absolutely. That's what the surety bond is* in addition to the art itself. So in the financial business it's called a wrap, where you wrap an asset with *an insurance policy*. [Emphases added.]

20.     As detailed above, DUNLAP's assertions that he procured insurance in the form of a "surety bond" were false because the document he purported to submit to the U.S. Treasury Department was fictitious. Additionally, the Meta1/Dunlap Bank Records reflect no premium payments or other evidence of DUNLAP or Meta1

9

Coin Trust having procured legitimate surety bonds or commercially available insurance.

21.     On or about October 3, 2018, DUNLAP appeared on another webcast called "The Sedona Connection," which was hosted by Promoter A. During that webcast, DUNLAP repeated many of the same false statements about having purchased an art collection appraised at $1 billion, physically possessing that art, including in vaults, and having insured that art for approximately $1 billion:

> Dunlap: We also bought a large art collection to originate this coin issuance. And so the art collection we bought it appraised—there's appraisals for it between $800 and $1.2 billion. And so we averaged them up and it came up to $1 billion. . . . We've got five. . . Five Picassos. . . Absolutely. It's publicly assigned to Meta1 Coin Trust.

> \* \* \*

> Promoter A: Now one of the questions that came up here [from a potential investor] it says, well, how do you keep the art protected? *You have basically very strong, secure places where they are kept, but also all the art is also insured as well.*

> Dunlap: *Absolutely. . . So we have a billion dollar coverage of the, of the portfolio that we presently hold right now.*

> \* \* \*

> Dunlap: . . . *Presently we possess the first collection.* What you're mentioning, [Promoter A], and what we want to do, we want to present this art. It's beautiful art. We don't want to just keep it in a vault. So our goal is to present it in museums that we wholly own or that we are working through a joint venture.[1] [Emphases added.]

---

[1] Months earlier, in an email to an investor on or about May 14, 2018, DUNLAP stated that he was "buying a major Jackson Pollock collection this week and it will drive the META 1 Coin up a lot." Again, the Meta1/Dunlap Bank Records reflect no such purchases, and law enforcement is unaware of any other evidence to suggest that any such purchases were made.

22. During that same webcast, DUNLAP and Promoter A encouraged potential investors to purchase the coin soon, stating that the current $22.22 price would no longer be available once the coin went public, which DUNLAP appeared to confirm would occur by the end of 2018. DUNLAP and Promoter A predicted that the coin's asset value would increase to as much as $40,000 per coin in the next 2-3 years as the additional "trillions of dollars" in art was to be added.

23. Versions of the Meta1 Coin White Paper available on the Meta1 Coin website during or near that time period contained false statements similar to those detailed above, including:[2]

- Meta1 Coin Trust "purchased a very famous art collection with impeccable provenance, countless expert reviews, and appraisals."

- "Additionally, the current market value of the art has been insured for the same amount of 1 Billion dollars . . ."

- "The loss of any art piece due to any reason will not affect the value of coin for long because the new art of equal amount can be acquired by filing a claim on the Surety Bond and then purchasing an art piece of the same amount.* The art/asset for the coin will be insured against loss by way of the Surety Bond. A claim filed against the Surety bond will immediately allow purchasing power for the acquisition of art of equal or higher value."

- "The META 1 Trust solely owns a One Billion Dollar Art Collection which is being assigned as security for [the coin.] The trustees ... have indemnified the Art Collection with a One Billion Dollar Surety Bond for added protection."

- The White Paper includes a chart showing: 450,000,000 coins, $1,000,000,000 Art Collection, $1,000,000,000 'Surety Art Bond', and $1,000,000,000 Indemnity Coin Bond."

---

[2] DUNLAP admitted having contemporaneous knowledge of the existence and content of those versions of the White Paper in his SEC testimony.

- "This continued process of adding additional art collections, plus the increase in the market value of the art, will launch META 1 Coin values in the Trillions of Dollars outperforming other coin currencies."

- "The possession of these valuable arts clearly shows that this coin is not based just on the promises for a better future. The existence of real assets distinguishes META 1 . . ."

- After Individual A filed his lawsuit against DUNLAP and Meta1 Coin Trust for breach of the art purchase agreement, the White Paper removed images of works from Individual A's art collection and replaced them with famous paintings, which appear to be Van Gogh's *Starry Night* and *Restaurant de la Sirene*, which (according to publicly available sources) are generally housed in the New York Museum of Modern Art and the Musee d'Orsay, respectively. That version of the White Paper continues to state that Meta1 Coin's security includes highly coveted art by some of the most renowned artists of all-time, including Salvador Dali, Vincent Van Gogh, Degas, Modigliani.

24. On or about October 9, 2019, during another webcast with Promoter A, DUNLAP stated that Meta1 Coin was no longer backed by any art and was instead backed solely by gold assets (detailed below). In explaining the reasons for the transition from art to gold, DUNLAP concealed the existence of the declaratory and monetary judgment against him and Meta1 Coin Trust and in favor of Individual A, and DUNLAP instead gave the following false excuses: (1) it had become "annoying" using art as a backing asset and art was not "any fun" anymore; and (2) the art market was drying up, making it less economically beneficial than gold:

> So when we—when we initially started Meta1 we were using an art portfolio, it's a billion-dollar art portfolio, 18 pieces, certified, approved and insured. Art, you know, art just got really annoying, quite honestly. We—so just think about the institutional scalability of art. There's art everywhere, there's are, everywhere's art. But just processing the art. After a couple fake van Goghs and whatevers, you know, and forensics, we're thinking, this isn't any fun. In addition to that, the art market got very efficient very fast. They saw what we were doing. They saw we were leveraging the art on our blockchain. So the deals weren't there

anymore; we weren't getting anything other than retail plus 10 percent. So the economics completely turned upside down.

## IV.   FALSE STATEMENTS ABOUT GOLD ASSETS

### A.   Gold Assets Purportedly Purchased, Owned, and Possessed by Meta1 Coin Trust—Increasing from "$2 Billion" to "$44 Billion" in Three Years

25.   As detailed below, from late 2019 through the date of this affidavit, the Promotional Materials have included numerous false representations that Meta1 Coin Trust had purchased and was in possession of billions of dollars of gold—in the form of gold bars secured in vaults and in-ground reserves—with the following increasing values:

a.   $2 billion of gold by in or about May 2019, resulting in a doubling of Meta1 Coin's asset value from $22.22 to $44.44 per coin;

b.   $4 billion of gold by in or about March 2020, resulting in another doubling of Meta1 Coin's asset value from $44.44 to $88.88 per coin;

c.   $8,888,888,888 of gold by in or about July 2020;

d.   $9,888,888,888 of gold by in or about June 2021;

e.   $15,488,888,888 of gold by in or about January 2022, resulting in an "asset value" of approximately $155 per coin, which was almost exactly seven times the original "asset value" of $22.22 per coin;[3]

---

[3] According to Board Member A and various statements in the Promotional Materials, DUNLAP calculated that purported per coin "asset value" by multiplying the total value of the gold assets by a "leverage" factor of 10 and then dividing that number by the total number of Meta1 Coins, which DUNLAP increased from 450 million to one billion coins at the time he increased the "asset value" of the gold to $8,888,888,888. Thus, $15,488,888,888 in

f.     $34,068,888,888 of gold by in or about May 2022;

g.     $44,444,444,444 of gold by in or about March 2023, resulting in an "asset value" of $444.44 per coin, which was almost exactly twenty times the original "asset value" of $22.22 per coin.

26.    A Meta1-associated website ([https://meta-exchange.vision/asset-explorer](https://meta-exchange.vision/asset-explorer)) currently includes the following chart depicting Meta1 Coin Trust's purported acquisition and ownership of the approximately $44.4444 billion in gold, resulting in a per-coin price of $444.44:



---

purported gold times 10 divided by 1 billion equals approximately $154.88 per coin, which is nearly an exact multiple of the original price of $22.22.

27. The Meta1/Dunlap Bank Records give no indication of purchases of any significant gold assets at any time.[4]

28. According to Board Member A and Board Member B, DUNLAP made claims of having gold assets but never provided either of them with any proof that he or Meta1 Coin Trust purchased, owned, or possessed any gold assets of any kind.

29. According to publicly available governmental and market data, the approximate $44.4444 billion worth of gold (at the spot price of $2,003.60 on 10/31/2023) would be equivalent to approximately 22 million ounces or approximately 693 tons of gold. By comparison, that would be equivalent to approximately 8.5% of all the gold owned by the U.S. government and more gold than is owned by the central banks of the vast majority of governments, placing it near tenth on the worldwide list just behind India and ahead of the Netherlands, Turkey, and Taiwan (according to data from gold.org). Similarly, as of April 2023, the largest publicly held gold mining company in the world was Newmont Corporation, with a market capitalization of approximately $40 billion (https://www.investopedia.com/newmont-boosts-its-offer-to-buy-newcrest-to-usd19-5b-7404858), which would mean that Meta1 Coin Trust's purported gold assets are more valuable than the market capitalization of the world's largest gold mining company. Market capitalization of Newmont Corporation was

---

[4] According to information and documents provided by Individual B, who owned an unpatented mining claim in Nevada, Individual B signed a quitclaim deed for that claim in or about February 2019 in favor of an entity controlled by DUNLAP at the direction of Individual B's joint venture partner. However, after the joint venture partner failed to pay Individual B the $2.5 million due to him under the joint venture agreement, Individual B considered the agreement void and demanded that DUNLAP return the deed, which DUNLAP did return on or about March 24, 2020.

approximately $29.53 billion on October 31, 2023, and it still ranked as the largest gold mining company according to companiesmarketcap.com.

**B. Specific False Statements About Gold, including Gold in Vaults and the "KPMG Audit" of the Gold**

30. During the Sedona Connection webcast with Promoter A on or about October 9, 2019, DUNLAP stated that Meta1 Coin Trust owned "tons of gold," including a large quantity of above-ground gold that was secured "in vaults" and which had a "fresh safekeeping receipt," meaning that "a third party audited the gold" and the gold bars had "the proper title and chain of title."

31. During that same webcast, DUNLAP also stated that: (1) Meta1 Coin Trust was in possession of $1 trillion in assets; (2) the coin's value would increase from $44 to $22,000 per coin once all of those assets were assigned to the coin; and (3) DUNLAP had received an offer to sell all of the outstanding coins to a single individual for $8 billion, which offer he refused.

32. Also during that same webcast, when asked by a prospective investor where he got the money to buy all that gold, his initial response was simply, "I make money." A review of the Meta1/Dunlap Bank Records do not reflect DUNLAP receiving any significant income (other than the proceeds from the fraud scheme itself), and those records reflect no payments for the purchase of any gold.

33. Also during that same webcast, DUNLAP and Promoter A stated that in the near future they were going to do a livestream video program from the purported vault "with this gold all around us":

16

> Dunlap: So we received—we have a large quantity of above-ground gold, and But these numbers will be published on the—on the blockchain. . . . Me and [Promoter A] were trying or were going to do a actual broadcast from the vault.
>
> Promoter A: Did you hear that, folks? We were actually—we were hoping we could do that this week.
>
> Dunlap: Yeah.
>
> Promoter A: But it wasn't quite ready. But in the near future, Robert and I are going to go to the vault where all this above-ground gold is and we're going to do a live program with this gold all around us.
>
> Dunlap: Yes.

34.     Based on a review of the Promotional Materials, DUNLAP never conducted any livestream webcast from a vault and never published any other proof of Meta1 Coin Trust owning or possessing large quantities of gold.

35.     On or about January 8, 2020, during another webcast with Promoter A, DUNLAP stated that he was in the process of engaging a "big six" auditing firm to audit the gold:

> We're in the process of an audit, and with this audit, we have to bring the price of the coin up. . . Until we have a third party that's going to do, like, *a big six accounting firm, law firm, they're going to do the audit*, that's the requirement. When they do the audit, it's—it's going to be shocking when you find out how many—*how much we have in assets, in possession, in vault, verifiable by third parties*, you know, legit, you know, very, very legit metal. So, with that said, we are—soon when we do this audit—we're going to do this before the major launch—the price of the coin will be established based on the assets that we really have. . . [Emphases added.]

36.     On or about January 15, 2020, during another webcast with Promoter A, DUNLAP stated that he had retained KPMG to perform the gold audit:

17

> [W]hat we're doing right now . . . is we're having a big six accounting firm–they're still a big six, it's—KPMG is going to do their audit of our— of our metal reserves, and that's being scheduled as we speak right now. And so, the third-party audit is very important. . . And so, anyway, that's where we are right now, and we're in the process of auditing our metal reserves.

During that same webcast, Promoter A discussed the importance of the purported KPMG audit:

> Folks, if you caught what [DUNLAP] just said, you know, some of you have been asking, well, how do we know about this gold? How do we know that it's asset—asset backed? When you've got KPMG, one of the largest auditing firms in the world doing the audit . . . on Meta1, verifying the amount of gold, the value of the gold, you have the authentication that's there, this is for real. This is the real stuff. . . You can't get much better than that.

37. On or about February 12, 2020, during another webcast with Promoter A, DUNLAP stated that the audit was "in process right now."

38. According to representatives of KPMG LLP, DUNLAP's and Promoter A's assertions about KPMG being engaged to perform an audit for Meta1 Coin Trust were untrue. Specifically, KPMG LLP conducted a search of its business records, which reflected no evidence that Meta1 Coin Trust, DUNLAP, or any of their affiliates were ever Audit, Tax, or Advisory clients of that firm.

39. On or about March 10, 2020, a newsletter emailed to investors and potential investors stated that an additional $2 billion in gold (totaling $4 billion) had been added to back the Meta1 Coin, and that DUNLAP would be authorizing further additions:

> As of March 10th, 2020, META 1 Coin has officially assigned additional assets to the coin resulting in a 100% gain. The coin value has increased from $44.44 to $88.88 US Dollars. Many of our early coin holders have

18

experienced 200% gains during the pre-launch phase. It is expected that all META 1 Coin holders will continue to see this kind of momentum over the coming months. The current GOLD ASSETS assigned to the coin are only a portion of the total META 1 holdings. The META 1 team has been deliberating over the pace of 'asset assignment' to the coin. Robert Dunlap, Executive Trustee, will be authorizing additional gold assignment to the coin during the pre-launch phase to maintain balance with the growing META 1 asset portfolio. In other words, the value of META 1 Coin will again increase in value before the public launch.

40. On or about March 24, 2020, another newsletter emailed to investors and potential investors purported to provide an update on the supposed audit, stating that the audit to date supported a coin value above $1,000 but that Meta1 Coin Trust's "legal team" had advised them not to release any other details of the audit until completed:

Regarding the META 1 Asset Evaluation - We understand and appreciate that people have a natural curiosity and will follow up on the information that is revealed about the audit. Our desire is to be transparent, however, our legal team has advised us to avoid releasing specific details regarding the audit until such time as the coin goes public. This is an important step to safeguard the security of the coin and to protect assets from criminal activity. Although it is not completed, we can share that the evaluation, along with the projected trading contract data, support a coin value in the 1000's.

41. On or about May 2, 2021, DUNLAP had a video Zoom call with investors and potential investors, during which DUNLAP falsely stated that their previous auditor (KPMG) had resigned due to the pending SEC investigation, but that a "new auditor" had been retained and the new auditor's report would be posted on the website:

We are having a auditor audit [the gold assets], a third party. I know we have been saying that. The previous auditor, umm, got a little bit of attention from our friends with the SEC. We have a new auditor that is

19

going to audit all the assets and you will see their, their findings on this, on this page actually.

42.    Two days later, on or about May 4, 2021, a newsletter emailed to investors and potential investors announced that additional gold assets are being added, providing a link to a Meta1-associated website, which website showed the new purported value of gold assets would be almost $10 billion following the allocation of the assets. (As noted above, by March 2023, DUNLAP and Meta1 Coin Trust claimed to have gold assets worth over $44 billion.)

43.    Beginning no later than May 2021 and continuing to the date of this affidavit, one of the Meta1-associated websites has included the following statement regarding the purported gold audit, including that the auditor's opinion letter would be published but that it was delayed because of the COVID pandemic (highlighting added):

> META 1 COIN TRUST HAS FIDUCIARY RESPONSIBILITIES TO PROTECT TRUST ASSETS. BASED ON THE ACTIONS OF THE FEW IN REGARDS TO MASSIVE ATTACKS ON META 1 COIN ASSETS AND OR LIKE BENEFICIARY ASSETS. META 1 COIN IS NOT PUBLICLY PUBLISHING GOLD ASSET LOCATIONS, GOLD ASSET UNDERWRITING AND OR COMMERCIAL REGISTRY FILINGS REGARDING GOLD ASSETS AS PREVIOUSLY COMMUNICATED. META 1 COIN TRUST IS WORKING WITH A PRIVATE THIRD PARTY ORGANIZATION TO CERTIFY ALL ASSET UNDERWRITING AND WILL PUBLISH AN OPINION LETTER THAT WILL BE THEN PUBLISHED ON THE META BLOCKCHAIN. DUE TO THE COVID EVENT THIS PROCESS HAS BEEN DELAYED AND IN PROCESS.

44.    Based on a review of the Promotional Materials (including the Meta1-associated websites), no audit findings, report, or opinion has ever been published by DUNLAP or Meta1 Coin Trust. Based on my training and experience and knowledge of the investigation, as well as my personal knowledge concerning the course of the

COVID pandemic, the pandemic was and is a false excuse that DUNLAP has used to support his false statements about the existence of an audit and to lull investors into believing that their investments were backed by billions of dollars of gold, when, in fact, they are not.[5]

**C.  Fictitious Gold "Indemnity/Surety Bonds" to the U.S. Treasury**

45.  Beginning no later than May 2021 and continuing to the date of this affidavit, one of the Meta1-associated websites has contained statements purporting to reflect that the billions of dollars in gold was and is insured by what have alternatively been called "Supporting Bonds," "Surety Bonds," and "Indemnity Bonds." For example, the website contains the following page purporting to show that one of the $500,000,000 gold assignments was backed by a "supporting bond of equal value" with a specific "Surety Bond Number":

---

[5] According to information and emails provided by Consulting Firm A, on or about May 5, 2022, that firm received an unsolicited email from a representative of Meta1 Coin Trust, stating that the representative was seeking to engage that firm to provide an "opinion letter/audit report" for undisclosed "in-ground deposits" of gold (*i.e.*, not gold bars in vaults). During a subsequent phone call, the Meta1 representative refused to provide Consulting Firm A with any other information regarding the supposed in-ground gold, including the general region, country, or continent where the gold deposits were purportedly located, or how the assets were acquired. Consulting Firm A did not agree to perform any services for Meta1 Coin Trust.



By clicking on the "Document Link" on that page (in orange), the website led to a single-page pdf referring to a purported "Private Indemnity Bond," as follows (highlighting added):



**(2) GOLD RESERVE ASSIGNMENT OF $500,000,000.00 WITH SUPPORTING BONDS**

META HOLDINGS TRUST GOLD RESERVE ASSIGNMENT OF (FIVE HUNDRED MILLION US DOLLARS ($500,000,000.00) IN FAVOR OF META 1 COIN TRUST: META BLOCK CHAIN ID: 9e40bec4c6a1d89e9b1f6f1e539498f33050d66e647de82d2f5e4dfc1ea4fde3

META HOLDINGS TRUST GOLD RESERVE ASSET IN FAVOR OF META 1 COIN TRUST: META BLOCKCHAIN SECURITIZED A GOLD RESERVE  BLOCKCHAIN.

PRIVATE INDEMNITY BOND BG535327277-6421 $500,000,000.00 IN FAVOR OF META 1 COIN TRUST: META BLOCK CHAIN ID: 9e40bec4c6a1d89e9b1f6f1e539498f33050d66e647de82d2f5e4dfc1ea4fde3 BOND BG535327277-6421 INSURES THE PRINCIPAL GOLD RESERVE ASSET

22

The website also includes virtually identical pdfs (except for the dollar amounts, dates, and purported bond numbers) for all of the $44 billion in purported gold assignments.

46.     As DUNLAP did with the purported "Surety Bond" for the purported art, DUNLAP has submitted one or more fictitious documents to the U.S. Treasury Department in support of the false gold "Indemnity/Surety Bonds." For example, on or about April 28, 2021, DUNLAP sent the following document to the U.S. Treasury Department (titled "Bill of Exchange"), which DUNLAP signed as "drawer," purporting to direct the government to assign $500 million from his personal treasury account to a purported account for the gold bond shown above:

47.     According to representatives of the U.S. Treasury Department's Bureau of the Fiscal Service, that "Bill of Exchange" was a fictitious instrument, which,

contrary to its assertions, did not bind or obligate the U.S. Treasury in any manner. Additionally, according to those same representatives and as noted above, DUNLAP had no account at the Treasury Department with any balance that would support such an instrument.

48. The version of the Meta1 White Paper available on October 31, 2023, falsely stated: "Surety Bonds of equal value of gold assignments are issued to insure the assigned assets. Surety Bonds provide insurance for the META 1 assigned assets providing redundancy for META 1 Coin."

49. The Meta1/Dunlap Bank Records reflect no payment of premiums for any commercial insurance or bonds relating to any gold assets.

**V.     USE OF "BOTS" AND TRADING SCRIPTS ON THE META EXCHANGE TO INFLATE THE PURPORTED MARKET VALUE AND VOLUME OF META1 COIN**

50. Part of DUNLAP's scheme involved the creation of the "Meta Exchange" website for Meta1 Coin. Based on my training and experience, a cryptocurrency exchange is an online facility through which users can trade or exchange cryptocurrencies for other cryptocurrencies or fiat currencies, which the users can then withdraw from the exchange. Examples of popular cryptocurrency exchanges are Coinbase and Kraken.

51. The Meta Exchange website includes a page resembling a real-time tickertape and order/trade book, such as for a commodity or equity. An example downloaded in or about May 2021 is as follows:



52.     As reflected in a zoomed-in version of a recent example, the order/trade book purports to show: (1) the most recent trade on the exchange to be at 9:58 a.m. at $503.6489 per coin (for a 0.135 fraction of a coin); (2) the resulting market price to be that same per coin amount of $503.6489; (3) bids and asks on either side of that market price; and (4) the volume of trades in the last 24 hours totaling approximately 579 coins:



53.     Those purported bids/asks, trades, and market price of approximately

$503 per coin are notable because they exceed the purported $444.44 "asset value" of

the coin based on the $44.44 billion in purported gold:



54.     According to Board Member A, who supervised the development of the

Meta Exchange until in or about September 2021,[6] the vast majority, or possibly all

---

[6] According to Board Member A, DUNLAP fired him in or about September 2021 following Board Member A questioning DUNLAP's failure to fund cryptocurrency wallets controlled by the Meta Exchange with the other cryptocurrencies that the exchange purported to cover.

of the purported trades on any given day, reflected on that exchange were not actual trades executed by actual users. Instead, DUNLAP approved the use of software programs called "decentralized exchange bots" and trading scripts. Those "bots" are assigned predefined parameters to place bids/asks and fill up the order book on the exchange. Trading scripts are then used to execute trades on the exchange. According to Board Member A, DUNLAP approved the use of those bots to create the false appearance of an active market on the exchange website by having the bots place bids/asks and the scripts, using multiple accounts, to periodically conduct actual trades with each other, when, in fact, no real user was on either side of those trades. Board Member A understood the purpose of using the bots in that way was to create the false appearance of market activity and to set a market price.

## VI.    FALSE STATEMENTS ABOUT THE SEC

55.     On or about April 24, 2019, during a webcast with Promoter A, DUNLAP and Promoter A discussed a purported conversation that DUNLAP falsely stated he had with an unidentified lawyer at the SEC. Specifically, DUNLAP stated that the SEC lawyer told him that he was "extremely impressed" with Meta1 Coin and that Meta1 Coin is "leading the way in equity"—so much so that the SEC lawyer was personally investing in Meta1 Coin:

> Promoter A: You know, we've had these people that have just been viciously attacking us and calling us scammers. And they've been telling everybody, "Call the SEC. Call the SEC and report them." And here's what's so ironic. Robert, it was last night when we were talking, *you told me that you had recently had about a one-hour discussion with a man from the SEC. And the fact that he was so impressed with everything*

27

*that we're doing, that's absolutely upfront and legal, he came in and bought coins.* Was that correct?

Dunlap: *Absolutely.*

\* \* \*

Dunlap: So the person I was speaking with, has been working with, *is with the SEC, legal counsel for, you know, over a decade plus.* And when he understood the entirety of our presentation and our legal disposition, and the architecture that we created, *he was extremely, extremely impressed.* He had very little to say regarding any shortcomings or alleged illegalities. *There's no illegalities. He was just absolutely impressed.* And he actually is, *he's coming on board very strong with, you know, investing in the Meta1 coin. . .* The one thing *the SEC resource* did say, he said that we are leading the way with KYC, which is Know Your Clients. And our equity position, meaning the asset valuation and the asset itself. *He said we're leading the way in equity.* [Emphases added.]

56.     Subsequent to that webcast, DUNLAP was served by the SEC with a subpoena to appear for testimony.

57.     On or about May 30, 2019, DUNLAP appeared at the SEC's offices. Although Dunlap selectively refused to answer many of the questions (on the false basis that he is not subject to jurisdiction of the U.S. government, its agencies, or its courts), he did answer some. In that testimony, DUNLAP admitted that, contrary to his statements during the April 24 webcast, he had no prior contacts with anyone from the SEC.

58.     On or about March 16, 2020, the SEC filed a civil enforcement action against Meta1 Coin Trust, DUNLAP, Promoter A, and others, as well as a petition for a temporary restraining order, in the United States District Court for the Western District of Texas. *See SEC v. Meta1 Coin Trust, et al.,* No. 20CV273. That court issued the temporary restraining order, and the SEC served it, the summons, and the

28

complaint on DUNLAP by email on or about March 23, 2020. The temporary restraining order, among other things, barred DUNLAP and Meta1 Coin Trust from "directly or indirectly (through an entity they control or otherwise) participating in the issuance, purchase, offer, or sale of any securities," and DUNLAP and the others were ordered to file a sworn accounting of investor funds with the Court on or before March 26, 2020. *Id.*, Dkt. 8, p. 7-14. As the court later explained, the temporary restraining order "prohibited [DUNLAP and the other defendants] from continuing to defraud current and potential investors in the Meta 1 Coin and accept payments for the Meta 1 Coin." *Id.*, Dkt. 39, p. 3.

59.     On or about March 30, 2020, the court received the first of numerous letters from DUNLAP asserting that he was not subject to the court's jurisdiction, and subsequently he returned certain of the documents served on him with the word "Fraudulent" written on them. *Id.*, Dkt. 18, 27, 35, 64.

60.     On or about April 13, 2020, the court held a preliminary injunction hearing by telephone, at which DUNLAP failed to appear. *Id.*, Dkt. 30. The court granted a preliminary injunction the same day, which imposed the same terms as the temporary restraining order. *Id.*, Dkt. 31.

61.     After failing to respond to the summons and violating the terms of temporary restraining order and the preliminary injunction, the court issued an order to show cause why DUNLAP and the other defendants should not be held in contempt of court. The court conducted the hearing on the order to show cause on or about April 20, 2020, but DUNLAP again failed to appear. *Id.*, Dkt. 39, p. 1.

62.     On or about April 21, 2020, the court issued an order holding DUNLAP and Promoter A in civil contempt and ordering them to be "coercively incarcerated until they comply with the Court's orders," and the court issued bench warrants for their arrests. *Id.*, Dkt. 39.

63.     DUNLAP was able to evade arrest on the bench warrant. The warrant ultimately was returned unexecuted on or about July 2, 2021. *Id.*, Dkt. 127.

64.     Promoter A was arrested on or about May 29, 2020. *Id.*, Dkt. 68.

65.     On or about July 2, 2020, a Meta1 Coin newsletter emailed to investors and potential investors stated, "[Promoter A] has been illegally detained. Our legal team immediately acted in the defense of [Promoter A] and is looking forward to his imminent release." Those statements were false because: (1) Promoter A's detention was supported by a court-issued warrant and thus was not illegal; and (2) neither DUNLAP, Meta1 Coin Trust, or Promoter A had any "legal team" that ever appeared in the case or was working for his release.

66.     On or about August 21, 2020, the court clerk made an entry of default against DUNLAP and Meta1 Coin Trust. *Id.*, Dkt. 90.

67.     On or about October 5, 2020, Promoter A consented to entry of a partial judgment against him, which, among other things, permanently enjoined him from violating the securities laws and barred him from participating in the issuance or offering of any securities. *Id.*, Dkt. 101. The judgment also permitted the SEC to file a later motion seeking monetary penalties and disgorgement against Promoter A. *Id.*

30

68. On or about October 22, 2020, during a Zoom video call with investors and potential investors, DUNLAP falsely repeated that Promoter A's detention was unlawful and falsely stated that the SEC case had been settled "a long time ago":

> [Promoter A] was falsely detained. . . *The SEC case was legally settled a long time ago, in April* for those of you following along in the docket report. And anything past April, whatever the date was, I think it was the 9th of April, I can't remember, but is completely criminal. And we filed lots of charges, we have published lots of fun stuff over the last couple weeks. *There is nothing to worry about. There is no trial. There is nothing with the SEC...* [Emphases added.]

69. On or about November 18, 2020, the SEC filed a motion for a default judgment against DUNLAP and Meta1 Coin Trust, which judgment would include a permanent injunction and monetary remedies, including disgorgement and penalties, in an amount to be determined. *Id.*, Dkt. 109.

70. On or about January 8, 2021, the SEC and certain third-party relief defendants (Individual C and an entity controlled by him) filed an agreed motion for entry of a judgment requiring Individual C and his entity to disgorge approximately $7.4 million in proceeds that flowed to him from DUNLAP and the other defendants. *Id.*, Dkt. 112.

71. On or about January 23, 2021, during another Zoom video call with investors and prospective investors, DUNLAP falsely stated that: (1) the agreed judgment between the SEC and Individual C constituted a settlement as to himself and Meta1 Coin Trust; (2) "we paid that [$8 million] this week"; and (3) "we have settled on the public side with the SEC":

> Our good friends at the SEC are … there's a very active state on the private side. The public side which is our META 1 Trust out of Chicago

31

operated by . . . our good friend [Individual C] has settled with the SEC under great duress and protest. We refer to it as an extortion payment of little less than $8 million. *We paid that this week.* And obviously that is added to our various claims. You know, *so we have settled on the public side with the SEC. And, you know, kind of a summary of that is, you know, we paid $8 million. We are very well-financed.*

72.    In fact, neither DUNLAP nor Meta1 Coin Trust "paid $8 million" or contributed any amount toward the agreed third-party judgment against Individual C. Moreover, neither DUNLAP nor Meta1 Coin Trust had "settled" anything with the SEC. To the contrary, at that time, the motion for a default judgment against DUNLAP and Meta1 Coin Trust was still pending before the court. Additionally, according to the SEC, as of October 24, 2023, the only "payments" toward the agreed third-party judgment against Individual C resulted from: (1) an order requiring Individual C's bank to turn over approximately $1.4 million in previously frozen funds (*id.*, Dkt. 113, p. 3); and (2) additional payments by Individual C totaling less than $100,000. Thus, approximately $6 million is still owed by Individual C under his judgment, which amount has never been paid by Individual C, let alone by DUNLAP or Meta1 Coin Trust.

73.    On or about February 8, 2021, the court entered an order granting the SEC's motion for default judgment against DUNLAP and Meta1 Coin Trust, which entered the permanent injunction, required DUNLAP and Meta1 Coin Trust to disgorge all proceeds from the scheme, and awarded monetary penalties in an amount to be determined. *Id.*, Dkt. 114.

## VII.  MAILINGS OF CHECKS IN FURTHERANCE OF THE SCHEME, AND FRAUD PROCEEDS

74.    According to information and documents provided by investors, investors were routinely provided with instructions on how to mail checks for purchases of Meta1 Coins. Multiple investors mailed checks from within the Northern District of Illinois to addresses in other states as payment for their investments. For example, according to information and documents provided by Victim A, on or about February 19, 2022, at the direction of a representative of Meta1 Coin Trust, Victim A mailed a check by U.S. Mail for $33,325.50 from his home in Illinois to an address in Texas as payment for 150 Meta1 Coins at $222.17 per coin.

75.    Based on an analysis of the Meta1/Dunlap Bank Records and other materials, from April 2018 to February 2023, it appears that hundreds of investors have paid more than $10 million for purchases of Meta1 Coins.

## CONCLUSION

Based on the foregoing facts, I respectfully submit that there is probable cause to believe that ROBERT DUNLAP has committed the offense of mail fraud, in violation of Title 18, United States Code, Section 1341.

FURTHER AFFIANT SAYETH NOT.

/s/ *Jeffrey Jamrosz*

JEFFREY JAMROSZ
Special Agent,
Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone November 7, 2023.

Honorable Sheila M. Finnegan
United States Magistrate Judge